# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRIS CHISHOLM, GOVIND RAMABADRAN, SERGE BELOZEROV, DAVID RAMIREZ on Behalf of Themselves and All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>v.<br><br>BBC GLOBAL NEWS US, LLC<br><br>        Defendant. | **Case No.:**<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Chris Chisholm, Govind Ramabadran, Serge Belozerov, and David Ramirez ("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this class action Complaint against Defendant BBC Global News US, LLC ("BBC" or "Defendant"). BBC owns and manages a website located at https://www.bbc.com/ (the "Website"), which provides visitors with access to online articles, photos, videos, and multimedia content covering global news, current affairs, entertainment, and other informational programming.

## <u>NATURE OF THE ACTION</u>

1.      Courts have recognized that opaque digital tracking practices threaten consumer privacy. The unauthorized collection of a person's browsing activity, website interactions, and device identifiers constitutes an invasion of a basic expectation of privacy in online activity. Companies often represent that visitors may control whether their data is sold, shared, or tracked. When data continues to be transmitted after those representations have been made, the conduct is improper.

2.      BBC operates the Website, which allows visitors to browse and access multimedia content, including news articles, photos, videos, and other digital content. When visitors interact with the Website's privacy controls, including by selecting the option to manage privacy preferences, the Website displays a "Your Privacy Preferences" interface ("Privacy Settings"). The Privacy Settings state that BBC shares personal information collected through cookies and other means with Tracking Entities for purposes including targeted advertising, and other activities that may constitute a "sale" or "sharing" of personal information under applicable privacy laws. The Privacy Settings represent that visitors may exercise control over such practices by activating the "Do not sell or share my personal information" toggle and saving their choice, thereby purporting to enable visitors to limit or prevent the disclosure of their personal information to Tracking Entities for advertising and related purposes.



*Figure 1 - BBC's "Your Privacy Preferences" interface, representing that visitors may opt out of the sale or sharing of their personal information by selecting the "Do not sell or share my personal information" option and saving their choices.*

3.     The Website embeds tracking tools, including tracking cookies, on a visitor's browser immediately upon a visitor loading any webpage on the Website, before the visitor can view or act upon the options given in the cookie settings.

4.     The Website is engaged in the sale and delivery of prerecorded audiovisual materials. It offers users the option to subscribe by providing an email address or by paying a monthly or annual fee (the "Subscribers"). Subscribers gain access to additional content from the Website and Defendant, including prerecorded video materials.

5.     Even after visitors affirmatively toggle off the sale or sharing of personal information and reject all non-required cookies, the Website continues to deploy and transmit data via third-party tracking tools (the "Tracking Tools") to advertising and analytics companies (the "Tracking Entities"). Upon information and belief, these Tracking Entities include Piano, ScoreCard, Google Ads, and additional advertising technology partners whose Tracking Tools (including cookies) track visitors' browsing history, Website interactions, inputs, device information, session data, and unique identifiers across the Website.

6.     This tracking captures detailed interaction and behavioral data, including links, buttons, forms, and other on-page elements selected by visitors, as well as information entered into search fields. The data includes location information, viewed or requested webpages and videos, and interests, preferences, age, location, or other characteristics inferred from visitor behavior and content engagement. It also includes personal, device, and technical identifiers, such as device type, operating system, browser type; persistent visitor identifiers that enable recognition across sessions and websites; visitors' email addresses; and approximate geolocation data derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information."

7.      The Website's Privacy Settings materially mislead visitors about the use and sale of their data. Defendant presents visitors with purported privacy controls to prevent visitor data tracking, while enabling Tracking Entities to nonetheless monitor visitors' online behavior in real time, regardless of visitors' choice to prevent such tracking.

8.      Plaintiffs visited the BBC Website at least once in January 2026, in order to browse news, entertainment articles, and other digital content. Plaintiffs also visited the Website more recently in connection with the investigation underlying this action. During at least one such visit, Plaintiffs activated the "[d]o not sell or share my info" toggle to tell BBC not to sell or share their personal information and clicked "save my choice[.]" Relying on BBC's representations that the Privacy Settings meaningfully control[led] data collection and use, Plaintiffs reasonably believed that the Website would deactivate any Tracking Tools that would collect, disclose, and transmit their Website-related activity, communication, and data. Nevertheless, Defendant continued to collect, disclose, and transmit Plaintiffs' Sensitive Information to the Tracking Tools and Tracking Entities for advertising and measurement purposes.

9.      Defendant does not disclose that visitors' Sensitive Information, including personally identifiable information ("PII"),[1] would be captured by the Tracking Tools and then transmitted to Tracking Entities. Specifically, Defendant transmitted the PII of its Subscribers— who created accounts and provided their email addresses or paid for subscriptions—to Tracking Entities without consent.

10.     Defendant's conduct allowed the Tracking Entities to unlawfully intrude into Plaintiffs' Sensitive Information, private communications, invade Plaintiffs' fundamental right to

---

[1] 18 U.S.C. § 2710(a)(3) ("includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider").

privacy, and fraudulently misrepresented the Website's data-collection practices. In doing so, Defendant violated the Federal Wiretap Act, 18 U.S.C. § 2510, et seq.; the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, et seq.; the California Invasion of Privacy Act ("CIPA"), including Cal. Penal Code § 631 (illegal wiretapping) and § 638.51 (unlawful use of a pen register or trap and trace device); the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1770, et seq.; the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq.; New York's Deceptive Acts and Practices statute, N.Y. Gen. Bus. Law § 349; New York's False Advertising Law, N.Y. Gen. Bus. Law § 350; and committed intrusion upon seclusion, common law fraud and deceit, was unjustly enriched, and violated related statutory and common-law protections.

## PARTIES

11.    Plaintiff Chris Chisholm is, and has been at all relevant times, a citizen and resident of Alaska. Plaintiff Chisholm has been a paid subscriber of BBC for approximately five years and maintains an annual subscription. Plaintiff Chisholm's paid account provides exclusive access to audiovisual content provided by Defendant. Plaintiff Chisholm used Defendant's Website to read articles and watch videos, and regularly accessed digital content through his subscription. Through Defendant's placement of Tracking Tools on the Website, Plaintiff Chisholm's Sensitive Information was tracked as soon as he visited the Website. Despite Defendant's representations regarding user privacy and data controls, the Website continued to track Plaintiff Chisholm and intercept his personal information, including browsing activity and device identifiers. Plaintiff Chisholm would not have become a Subscriber or continued using the Website had he known that his Sensitive Information would be disclosed to unauthorized Tracking Entities.

12.    Plaintiff Govind Ramabadran is, and has been at all relevant times, a citizen of California. Plaintiff Ramabadran used Defendant's Website to read articles and watch videos. Plaintiff Ramabadran subscribed to a newsletter and emails from Defendant, providing his email address in exchange for news updates via email(s) from the Defendant. Through Defendant's placement of Tracking Tools on the Website, visitors' personal information, including browsing activity and device identifiers, was tracked as soon as they visited the Website. For example, when Plaintiff Ramabadran interacted with Defendant's Website on January 7, 2026, Plaintiff Ramabadran's Sensitive Information was disclosed to the Tracking Entities. Plaintiff Ramabadran began to receive unsolicited advertisements relating to the content he viewed. Plaintiff more recently visited the Website in connection with the investigation of this case and attempted to disable the Tracking Tools on the Website by using the cookie settings to decline all non-essential cookies. When he visited the Website in 2026, Plaintiff Ramabadran attempted to use the cookie settings to disable the Tracking Tools, believing the Website's claim that he could disable marketing cookies. Despite Defendant's assertions, choosing to decline all non-essential cookies did not disable the Tracking Tools. The Website continued to track Plaintiff Ramabadran and intercept his personal information, including browsing activity and device identifiers, after he chose to decline the marketing cookies. Plaintiff Ramabadran would not have used the Website had he known that his Sensitive Information would be disclosed to unauthorized Tracking Entities.

13.    Plaintiff Serge Belozerov is, and has been at all relevant times, a citizen of Massachusetts. Plaintiff Belozerov used Defendant's Website to read articles and watch videos. Plaintiff subscribed to a newsletter and emails from the Defendant, providing his email in exchange for news updates through email from the Defendant. Through Defendant's placement

of Tracking Tools on the Website, visitors' personal information, including browsing activity and device identifiers, was tracked as soon as they visited the Website. For example, when Plaintiff Belozerov interacted with Defendant's Website on January 9, 2026, Plaintiff Belozerov's Sensitive Information was disclosed to the Tracking Entities. Plaintiff Belozerov began to receive unsolicited advertisements relating to the content he viewed. Plaintiff more recently visited the Website in connection with the investigation of this case and attempted to disable the Tracking Tools on the Website by using the cookie settings to decline all non-essential cookies. When he visited the Website in 2026, Plaintiff Belozerov attempted to use the cookie settings to disable the Tracking Tools, believing the Website's claim that he could disable marketing cookies. Despite Defendant's assertions, choosing to decline all non-essential cookies did not disable the Tracking Tools. The Website continued to track Plaintiff Belozerov and intercept his personal information, including browsing activity and device identifiers, after he chose to decline the marketing cookies. Plaintiff Belozerov would not have used the Website had he known that his Sensitive Information would be disclosed to unauthorized Tracking Entities.

14.    Plaintiff David Ramirez is, and has been at all relevant times, a citizen of California. Plaintiff Ramirez used Defendant's Website to read articles and watch videos. Plaintiff Ramirez created and maintains a registered user account with BBC, thereby establishing a formal relationship with the Defendant involving the exchange of his personal information for his account and providing access to audiovisual material provided by the Defendant. Through Defendant's placement of Tracking Tools on the Website, visitors' personal information, including browsing activity and device identifiers, was tracked as soon as they visited the Website. For example, when Plaintiff Ramirez interacted with Defendant's Website on January 14, 2026, Plaintiff Ramirez's Sensitive Information was disclosed to the Tracking Entities.

Plaintiff Ramirez began to receive unsolicited advertisements relating to the content he viewed. Plaintiff Ramirez more recently visited the Website in connection with the investigation of this case and attempted to disable the Tracking Tools on the Website by using the cookie settings to decline all non-essential cookies. When he visited the Website in 2026, Plaintiff Ramirez attempted to use the cookie settings to disable the Tracking Tools, believing the Website's claim that he could disable marketing cookies. Despite Defendant's assertions, choosing to decline all non-essential cookies did not disable the Tracking Tools. The Website continued to track Plaintiff and intercept his personal information, including browsing activity and device identifiers, after he chose to decline the marketing cookies. Plaintiff Ramirez would not have used the Website had he known that his Sensitive Information would be disclosed to unauthorized third parties.

15.    BBC Global News US, LLC is a limited liability company organized and existing under the laws of the State of New York. Its principal mailing address is 1120 Avenue of the Americas, 5th Floor, New York, NY 10036. BBC Global News US, LLC conducts business in New York and throughout the United States, including by operating, publishing, and distributing digital news and media content through the Website and related online platforms.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e), and Video Privacy Protection Act, 18 U.S.C. § 2710(b)(1).

17.     This Court has personal jurisdiction over Defendant because Defendant is registered to do business in this District and maintains its principal place of business in this District.

18.     Venue is proper in this Court because Defendant's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## COMMON FACTUAL ALLEGATIONS

### I.    Legislative Background

#### A.    The Federal Wiretap Act

19.     The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[2]

20.     The Wiretap Act initially focused on government wiretapping. Congress later became concerned that technological developments such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" had outpaced the statute.[3] Thus, in 1986, Congress amended the Wiretap Act through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions comparable to government intrusions.[4]

---

[2] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).
[3] Senate Rep. No. 99-541, at 2 (1986).
[4] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).

21.     The ECPA primarily focused on two types of computer services that were prominent in the 1980s: (i) electronic communications between users; and (ii) remote computing services like cloud storage or third-party processing of data and files.[5]

22.     Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person "intentionally intercepts . . . or procures any person to intercept . . . any . . . electronic communication" (2511(1)(a)), "intentionally discloses . . . to any other person the contents of any . . . Electronic communication, knowing or having reason to know that the information was obtained through the interception of a . . . Electronic communication in violation of this subsection" (2511(1)(c)), or "intentionally uses . . . The contents of any . . . Electronic communication, knowing or having reason to know that the information was obtained through the interception of a . . . Electronic communication in violation of this subsection (2511(1)(d)).

23.     The Wiretap Act initially concerned the government's use of wiretaps, but Congress became concerned that technological advancements such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" were rendering the statute out of date. 18 U.S.C. §2511(2)(d).

24.     While visitors communicated with Defendant on the Website through their browsers, the contents[6] of those communications were intercepted by Tracking Entities through the Tracking Tools.

---

[5] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).
[6] The contents of Plaintiffs' and visitors' communications include: 1) search terms submitted to the site; 2) the location and contents of webpages visited by visitors; and 3) the PII discussed in Section III(A).

25.     Defendant intentionally implemented the Tracking Tools on the Website to intercept Plaintiffs' communications and transmit those communications to Tracking Entities for use in advertising and marketing activities.

26.     Plaintiffs neither knew of nor consented to the exposure of their legally protected communications with Defendant to Tracking Entities.

**B.      The Video Privacy Protection Act**

27.     The events leading to the enactment of the VPPA arose in 1988, when a newspaper published the video rental history of Supreme Court nominee Judge Robert H. Bork's family. During subsequent floor debate, members of Congress stated that:

> In an era of interactive television cables, the growth of computer checking and check-out counters . . . all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch . . . I think it is something that we have to guard against.

S. Rep. 100-599, at 5-6.

28.     Congress recognized that "information pools" created privacy interests that impacted individual expression, association, and the exercise of constitutional freedoms. *Id.* at 7.

29.     Senator Patrick Leahy and the late Senator Paul Simon observed that records of this nature offer: "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.* at 7-8 (statements of Sens. Simon and Leahy, respectively).

30.     Senator Simon complained that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.* at 6-7.

31.     Senate Bill 2361 was then drafted to "give meaning to, and thus enhance, the concept of privacy for individuals in their daily lives" by prohibiting "unauthorized disclosures of personal information held by video tape providers." *Id.* at 6.

32.     The VPPA regulates the disclosure of information about consumers' consumption of video content, imposing specific requirements to obtain consumers' consent to such disclosure. Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

33.     The statutory damages were deemed "necessary to remedy the intangible harm caused by privacy intrusions." *Id.* at 8.

34.     In 2012, Congress amended the VPPA. In so doing, Congress reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

35.     During a Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[7]

---

[7] *See Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, *available at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited Dec. 17, 2025).

36.     Multiple courts have applied the VPPA to online video services, including websites that stream prerecorded content.[8]

37.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

38.     The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

39.     Congress designed the VPPA to protect transactions in which a consumer requests or obtains specific video materials or video services from a VTSP. The statute covers such transactions, whether they occur in digital or physical form.

40.     A video tape service provider ("VTSP") is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." 18 U.S.C. § 2710(a)(4).

41.     Courts have interpreted the VPPA's definition of a video tape service provider broadly. A provider need not deal exclusively in audiovisual content; it suffices that such content forms part of the provider's business. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 547-48 (2d Cir. 2024).

---

[8] *See, e.g., Sellers v. Bleacher Report, Inc.,* No. 23-cv-00368-SI, 2023 U.S. Dist. LEXIS 131579, at *15-18 (N.D. Cal. July 29, 2023) (VPPA sufficiently applied to sports news website); *Jackson v. Fandom, Inc.,* No. 22-cv-04423-JST, 2023 U.S. Dist. LEXIS 125531, at *6 (N.D. Cal. July 20, 2023) (VPPA applies to gaming and entertainment website); *Louth v. NFL,* No. 1:21-cv-00405-MSM-PAS, 2022 U.S. Dist. LEXIS 163706, at *11-12 (D.R.I. Sep. 12, 2022) (holding VPPA applied to NFL's videos accessible through mobile app).

42.     A consumer is defined as "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1). The broad language defining "consumer" comports with the initial purpose of the VPPA.

43.     In interpreting the VPPA, a 'consumer' includes a renter, purchaser, or subscriber of any of a provider's 'goods or services,' whether audiovisual or not. *Salazar*, 118 F.4th at 548-549.

44.     Defendant delivers and provides prerecorded audiovisual materials to Plaintiffs and Class Members through the Website.

45.     Plaintiffs and Defendant maintained a consumer relationship involving the request for and delivery of prerecorded video content.

46.     Defendant disclosed Plaintiffs' personally identifiable information to Piano in a knowing and systematic manner, without obtaining Plaintiffs' consent.

**C.      The California Invasion of Privacy Act**

47.     CIPA was enacted in 1967 for the expressly stated purpose "to protect the right of privacy of the people of [California]."[9] The California legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[10]

48.     CIPA serves as California's counterpart to the Federal Wiretap Act; each statute addresses similar elements and targets similar privacy harms.

---

[9] Cal. Penal Code § 630.
[10] *Id.*

49.    To protect people's privacy, legislators broadly protected communications being sent to or received from California.[11] Notably, California set out to prohibit (i) intentional wiretapping or (ii) willful attempts to learn the contents of communications, (iii) attempts to use or transmit information obtained through wiretapping, or (vi) aiding, agreeing with, employing, or conspiring with any person(s) to unlawfully do, permit, or cause the preceding three wrongs.[12]

50.    CIPA also prohibits the installation of a "pen register" or a "trap and trace device" without first obtaining a court order.[13]

51.    "Pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."[14]

52.    "Trap and trace device" is defined as a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."[15]

53.    In light of CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third parties' communications." *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

---

[11] Cal. Penal Code § 631-32.
[12] *Mastel v. Miniclip SA,* 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).
[13] Cal. Penal Code § 638.51.
[14] *Id.* § 638.50(b).
[15] *Id.* § 638.50(c).

54.     Defendant did not obtain any court order authorizing the use of Tracking Tools to record or capture Plaintiffs' and Class Members' communications with the Website, and such use violates CIPA § 638.

## II.     How Websites Work

55.     Websites are hosted on servers, in the sense that their files are stored on and accessed from servers. Websites are, in part, "run" on a visitor's internet browser, as the browser loads and processes the website's code to display the webpage.

56.     Websites are a collection of webpages. A webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[16]

57.     Each webpage has a unique address, and two webpages cannot be stored at the same address.[17]

58.     When a visitor navigates to a webpage (by entering a URL address directly or clicking a hyperlink containing the address), that visitor's browser contacts the DNS (Domain Name System) server, which translates the web address of that website into a unique IP (Internet Protocol) address.[18]

59.     An IP address is "a unique address that identifies a device on the internet or a local network." Essentially, an IP address is:

---

[16] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited Jan. 7, 2026).

[17] *Id.*

[18] *How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Jan. 7, 2026).

The identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.[19]

60.     When a visitor's browser navigates to a webpage, it sends an HTTP request to the server identified by the webpage's IP address (the "Request URL"). This request is for the specific resource located at the URL. If the server fulfills this request, it issues a response (the "HTTP Response"), which includes the status of the request and, typically, the requested content. This content is then transmitted in small chunks, known as data packets, and reassembled into the complete webpage upon arrival by the visitor's browser.[20]

61.     This Request URL includes a domain name and path, which identify the specific content being accessed on a website and its location within the website's structure.

62.     The Request URL typically contains parameters. Parameters are values added to a URL to transmit data to the recipient, prefaced by a question mark to signal the use of parameters. Parameters direct a web server to provide additional context-sensitive services,[21] as depicted below:



*Figure 2 - Mozilla's diagram of a URL, including parameters[22]*

63.     Website owners or web developers write and manage the URLs for their websites.

---

[19] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Jan. 7, 2026).
[20] *Id.*
[21] To see examples of how Defendant used parameters to provide additional information here, *see, infra,* Section C(2).
[22] *What is a URL?*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Jan. 7, 2026).

64.     URL encoding is an essential process to ensure that data is safely transmitted via URLs. URL encoding converts characters into a format that can be transmitted over the Internet.[23] For example, URLs cannot contain spaces; URL encoding normally replaces a space with a plus (+) sign or with %20.

65.     The American Standard Code for Information Interchange (ASCII) was designed in the early 1960s as a standard character set for computers and electronic devices.[24] Today, UTF-8 is the Internet's most common character encoding.[25]

66.     URL decoding is the process of URL encoding in reverse so that the URL is in a more readable format.[26] To demonstrate:



*Figure 3 – Demonstrating URL encoding and decoding[27]*

---

[23] *Id.*

[24] *HTML ASCII Reference*, W3 SCHOOLS, https://www.w3schools.com/charsets/ref_html_ascii.asp (last visited Jan. 7, 2026).

[25] *UFT-8*, MOZILLA, https://developer.mozilla.org/en-US/docs/Glossary/UTF-8 (last visited Jan. 7, 2026).

[26] *What IS URL Decoding and URL Encoding?*, GOCHYU (Oct., 2020), https://gochyu.com/blog/url-encode-decode (last visited Jan. 7, 2026).

[27] Viraj Shetty, *URL Encoding in a few minutes*, YOUTUBE (Sept. 5, 2023), https://www.youtube.com/watch?v=ru0iCHsmsLc (last visited Dec. 22, 2025).



*Figure 4 – Sample webpage used to demonstrate a webpage URL*



*Figure 5 – Request URL Header of sample webpage from Figure 4, encoded for transmission (compare with decoded URL in Figure 5)*



*Figure 6 – Decoded, parsed Payload data from Request URL in Figure 4, showing easy-to-read parameters and metadata*

67.     After the visitor sends the Request URL, the server sends the HTTP Response to the visitor, and the visitor's browser assembles the HTTP Response packets into the source code of the webpage. The webpage code is then processed by the visitor's browser and "rendered" into a visual display according to the instructions of the HTML, CSS, and JavaScript code.[28] This is the visible, and usually interactable, website that most people think of.

68.     To provide more complex website functionalities, website developers will include more complex commands written in non-HTML computer programming languages, such as JavaScript snippets, which are embedded or called within the HTML code.[29]

69.     Such complex tasks include scheduling appointments or monitoring and reporting visitor activity.

---

[28] *How the web works?*, MOZILLA, How_the_web_works (last visited Jan. 9, 2026).
[29]     *See     JavaScript     Basics*,     MOZILLA,     https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Jan. 7, 2026).

70.     In short, the Internet relies on a constant back-and-forth stream of requests being sent between the visitor and servers.

71.     Unbeknownst to visitors, as they browse the Website, the Tracking Tools, including third- and first-party cookies, capture and record both incoming and outgoing requests that make up visitors' communications with the Website.

## III.     The Website and the Tracking Tools

72.     On the Website, Defendant utilized Tracking Tools, including those created by Piano, ScoreCard, and Google, to intercept and disclose visitors' Sensitive Information without seeking or obtaining visitors' consent.

### A.     The Piano Analytics Tool

73.     Piano is a digital revenue optimization company, whose products are aimed at improving digital interactions between companies and its customers.

74.     One of the tools offered by Piano is Analytics Data Collection ("Piano Analytics"), which Piano recommends be powered by its Piano Analytics SDK.[30]  Piano Analytics tracks events and other actions taken by a visitor on the Website.

75.     Piano Analytics data can be gathered in one of two ways: (1) it can be gathered client-side, meaning that the data is sent from the browser of a visitor of the site directly to Piano, or (2) it can be gathered server-side, meaning that the data is sent from Defendant's server directly to Piano.[31]

---

[30] *Piano Analytics Data Collection,* https://analytics-docs.piano.io/en/analytics/v1/piano-analytics-data-collection (last visited Jan. 7, 2026).
[31] *Id*



*Figure 7 – Visitors' data being sent directly to Piano*

76.    When the data is sent client-side, a website visitor's browser sends an HTTP POST request to Piano. POST requests can be used by browsers to send data to a server.[32] This POST request contains information about the actions of the visitor, such as the URL of the page they visited, as well as data about the visitor themselves, such as their email address, location, or IP address.

77.    The information Piano Analytics collects provides Defendant with a better understanding of who its customers are and how they navigate around the Website.

78.    Defendant has implemented Piano Analytics on the Website, sending visitors' Sensitive Information to Piano without their consent. Any ordinary visitor views the Piano Analytics by accessing the dev tools on their browser, which allows an ordinary viewer to view every request a website is sending to and from other servers. The figure below demonstrates the Piano Analytics on the Website.

---

[32] *HTTP Request Methods* https://www.w3schools.com/tags/ref_httpmethods.asp (last visited on Jan. 7, 2026).



*Figure 8 – The Piano Analytics on the Website*

79.    As shown in *Figure 8* above, Piano Analytics causes a visitor's browser to send a POST request to Piano at the same time that it requests the next webpage from the Website. Piano Analytics intercepts this request and reads its contents while it is in transit to the Website.

80.    The POST request contains both a text file, which can be viewed in the Payload tab of the dev tools, as well as further information describing the visitor that is sent to Piano, which can be viewed in the Response tab of the dev tools. The figure below demonstrates the Payload tab.



*Figure 9 – The Payload Tab of the Piano Analytics*

81.    Piano Analytics causes a visitor's browser to send the URL of the webpage that a visitor is viewing, as well as the title, description, and creation time of the webpage.

82.    At all times, an ordinary person can view this information simply by accessing the Payload tab in their internet browser's dev tools.

83.    Piano Analytics also sends additional information about the visitor, including information that identifies them. This information is found in the Preview and Response tabs of the browser's dev tools. The figures below demonstrate the Preview and Response tabs.



*Figure 10 – The Preview Tab on the Website (Email censored to preserve privacy of the investigator)*

*Figure 11 – The Response Tab on the Website (Email censored to preserve the privacy of the investigator)*

84.    Piano Analytics causes a visitor's browser to send identifying information to Piano, including their unencrypted email address, an assigned, unique ID, and approximate geographic location.

85.    At all times, an ordinary visitor can view this information simply by accessing the Preview and Response tabs in their browser's dev tools.

86.    Using the data that is sent to Piano, which is visible and understandable to an ordinary visitor, any person can determine the identity of a Website visitor and the actions, including which webpages visitors visited and which videos were requested and watched, along with actions taken by the visitor on the Website.

87.     Piano makes it clear to its customers that it is their responsibility to obtain and manage consent from website visitors.[33] Piano asks its customers to display a cookie consent banner if they use Piano's service.[34] Defendant does not display a cookie consent banner on the Website.

**B.      Defendant Utilizes comScore's ScorecardResearch System To Monetize Visitors' Browsing Data**

88.     ScorecardResearch ("Scorecard") is a service of Full Circle Studios Inc., which is owned and operated by comScore. ScorecardResearch describes itself as "a leading global market research [company] that studies and reports on Internet trends and behavior."[35] ScorecardResearch states that they "conduct[] research by collecting Internet web browsing data and then use[] that data to help show how people use the Internet, what they like about it, and what they don't."[36] Scorecard Research offers two ways to collect data for website operators and others wishing to utilize its technology: (1) surveys, and (2) web tagging using the ScorecardResearch web beacons.[37]

89.     The ScorecardResearch web beacons are offered to website operators that wish to take part in the company's market research.[38] A company that elects to take part in such market research would place a ScorecardResearch web beacon into its website code, which allows comScore to observe "browser-level."[39] The ScorecardResearch privacy policy states that its web

---

[33] *Consent management* https://analytics-docs.piano.io/en/analytics/v1/consent-management (last visited January 7, 2026).
[34] *Id.*
[35] *Welcome*, SCORECARD RESEARCH, https://www.scorecardresearch.com/ (last visited Dec. 23, 2025).
[36] *Id.*
[37] *Id.*
[38] Teodora Beleaga and Joanna Geary, *ScorecardResearch (ComScore): What is it and what does it do?*, THE GUARDIAN (Apr. 23, 2012) https://www.theguardian.com/technology/2012/apr/23/scorecardresearch-tracking-trackers-cookies-web-monitoring (last visited Dec. 23, 2025).
[39] *Id.*

beacons will collect information including: (1) when your browser visited a website; (2) what page of the website you visited; (3) the title of the web page; and (4) your IP address.[40] After being aggregated, the data collected by ScorecardResearch may be kept for up to 90 days, and can be used for analytical purposes indefinitely.[41] According to comScore, "selected anonymous records relating to [a] specific site may be maintained indefinitely."[42]

90.    Scorecard intercepts the page views of a visitor on the Website, as depicted below:[43]



*Figure 12 – A request is sent to Scorecard containing the URL of the webpage viewed by a visitor of the Website*

91.    When websites utilize ScorecardResearch web beacons, ScorecardResearch derives a principal benefit in the form of revenue earned through the commercialization and sale of the data collected through those beacons in its product offerings. As noted in its Privacy Policy, ScorecardResearch: "use[s] the collected information to prepare analyses and reports regarding digital consumption behavior that we share with other businesses and organizations which are our customers. These reports help our customers meet their business goals by providing them with a

---

[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] Here, a test search was made using "blue jeans" as the Search Terms.

better understanding of digital consumption behavior, trends, and consumer preferences."[44]

Scorecard further states that the information obtained is also used by comScore "whose data are

routinely cited by major media outlets such as The New York Times®, The Wall Street Journal®,

and CNN®. The data are extensively relied upon by some of the world's largest media companies,

advertisers, film studios, and its strategic partners include the most important players in the TV

and digital media and advertising ecosystem."[45]

92.    Indeed, this is further borne out by its Privacy Policy, which states that:

> In order for us to give you quality experiences and to understand how you're using
> our services we often use other companies to process your personal information on
> our behalf. For example, sending you emails about things we think might interest
> you, to ask you what you think about our services, or to analyse data on how people
> use our digital services so we can improve them.[46]

93.    Scorecard engages in data tracking and sharing for the purpose of improving its

products and services and assisting in the operation of its business.[47] Through the continued

collection and use of data obtained from website visitors, ScorecardResearch is able to strengthen

and expand its product offerings. Those enhanced offerings permit further investment in

technologies designed to track visitor behavior and to commercialize that information through

sales to business partners.

94.    The information collected from the Website through ScorecardResearch Tracking

Tools, and later sold, is important to both ScorecardResearch and comScore. It allows each to

offer products and information to their clients and to derive revenue from those offerings.

---

[44] *ScorecardResearch Privacy Policy*, SCORECARD RESEARCH, https://www.scorecardresearch.com/privacy.aspx (last visited Dec. 23, 2025).
[45] *Id.*
[46] The BBC Privacy and CookiesPolicy, https://www.bbc.com/usingthebbc/privacy-policy (last Dec. 23, 2025).
[47] *Id.*

95.    ScorecardResearch Tracking Tools provide Defendant with the ability to measure visitor behavior on and across the Website, identify behavioral trends, and use that information to more effectively deliver targeted advertising.[48] As stated in the ScorecardResearch Privacy Policy, its "web tags" and cookies assist websites in counting visitors who have visited and viewed a webpage or portions of a webpage.[49] More effective consumer targeting through the Website increases revenues for the Defendant. Under standard online marketing practices, the Defendant receives a share of advertising revenue generated from ad conversions.

### C.    Google Tracking Tools

96.    Google offers a range of advertising products, each serving a distinct function within advertising portfolios.

#### 1.    Google Analytics

97.    Google Analytics ("GA") collects data about visitor interactions with a website. That data includes link clicks, button clicks, form submissions, conversions, shopping cart abandonment, items added to or removed from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[50]

98.    GA transmits collected interaction data to Google, which associates the activity with the website that generated it.[51] Notably, Google notifies web developers that developers should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[52]

---

[48] Stelian Pilici, *ScoreCardResearch - What Is It And What Does It Do?*, MALWARETIPS (Mar. 21, 2023) https://malwaretips.com/blogs/scorecardresearch/ (last visited Dec. 23, 2025).

[49] *About*, SCORECARD RESEARCH, https://www.scorecardresearch.com/about.aspx (last visited Dec. 23, 2025).

[50] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH BLOG (Jan. 4, 2024) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited Jan. 7, 2026).

[51] *About the Google tag*, GOOGLE, https://support.google.com/tagmanager/answer/11994839?hl=en (last visited Jan. 7, 2026).

[52] *Id.*

99.    GA functions through specific collection settings and fixed data transmission paths. Google acknowledges the legal implications of those practices and assigns responsibility for visitor disclosure to website developers, including Defendant.

100.    Here, Defendant added GA to the Website. That implementation caused Plaintiffs' webpage views to be intercepted and transmitted to Google, as shown by the example taken directly from the Website below:



*Figure 13 – Test search made on the Website resulted in sharing search terms with Google Analytics*

101.    After the data reaches those common destinations, Google products analyze the information and provide feedback that allows Defendant to monetize the collected data through targeted advertising.

### D.    Defendant Programmed the Website to Include the Tracking Tools

102.    Defendant voluntarily integrated the Tracking Tools into the Website's code. Defendant's use of Tracking Tools on the Website is performed pursuant to commercial agreements between Defendant and the Tracking Entities.

103.    The Website, by using the Tracking Tools, causes visitors' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a visitor's web browser and stored locally on the visitor's device. Cookies contain unique identifiers that enable a website to recognize and distinguish individual visitors. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and the Tracking Entities to identify the device making the request and to record a session reflecting the visitor's interactions with the Website.

104.    First-party cookies are placed directly on the visitor's device by the web server with which the visitor is knowingly communicating, in this case, Defendant's Website. First-party cookies are used to recognize visitors across repeated visits to the same website, to track on-site activity, and to generate marketing profiles based on that activity.

105.    Third-party cookies are placed by domains other than the Website's domain. When a visitor's browser loads a webpage containing embedded third-party cookies, the Tracking Entities' scripts determine whether their cookies already exist on the visitor's device. If no such cookies exist, the scripts cause those cookies to be stored. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual visitors across different websites, including the Website, and across multiple browsing sessions, to build detailed and encompassing marketing profiles on visitors.

106.    Third-party cookies placed on visitors' devices during interactions with the Website intercept and record visitors' communications for the Tracking Entities, enabling real-time tracking and collection of visitors' Sensitive Information.

107.    Cookies serve numerous commercial purposes, including: (i) analytics, such as measuring visitor engagement and Website performance; (ii) personalization, including remembering visitor preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on visitor profiles; and (iv) social media integration. By enabling the collection, analysis, and dissemination of visitor data, cookies support Defendant's and its partners' marketing operations and contribute directly to revenue generation and advertising effectiveness.

108.    Defendant owns and operates the Website, which provides access to entertainment content, including celebrity news, red carpet interviews, and related media content. When visitors interact with the Website by navigating pages, clicking links, or entering information, they transmit Sensitive Information directly to Defendant.

109.    Defendant intentionally integrated the Website with the Tracking Tools. As a result of that integration, visitors to the Website have first-party and third-party cookies placed on their devices and transmitted to Tracking Entities. Defendant controls the Website's software code and the selection and loading of Tracking Tools, and therefore controls whether cookies are placed and whether visitors' data is intercepted by the Tracking Tools and transmitted to Tracking Entities.

110.    In the Website's cookie consent and preference interface, Defendant states that it uses personal information to personalize visitor experience and for analytics, marketing, and advertising purposes.

111.    The Website's Privacy Settings interface further states that:

"[BBC] share[s] personal information collected through cookies or in other forms with third parties to allow them to show you targeted advertising on our properties and across the properties of other businesses … or for other purposes that may constitute a sale or sharing of personal information under some privacy laws. At any point, you can opt out of targeted advertising and the sale or sharing of your personal information."[53]

112.    In the Privacy Policy, Defendant provides additional disclosures regarding its use of cookies and states that Defendant and its affiliates collect or receive information concerning visitors' interactions with the Website.

In order for us to give you quality experiences and to understand how you're using our services we often use other companies to process your personal information on our behalf. For example, sending you emails about things we think might interest you, to ask you what you think about our services, or to analyse data on how people use our digital services so we can improve them.[54]

## IV.    Defendant Falsely Informed Visitors That They Could Opt Out of the Website's Use of Cookies

113.    When visitors, including those located in New York, visited the Website, they were able to access the Privacy Settings interface by clicking "[d]o not sell or share my info." The interface informed visitors that BBC shares personal information collected through cookies and other means with Tracking Entities to enable targeted advertising across BBC properties and other businesses' properties, including for purposes that may constitute a "sale" or "sharing" of personal information under applicable privacy laws. The interface further represented that visitors could exercise control over these practices by selecting the option labeled "Do not sell or share my personal information" and saving their choices, thereby purportedly allowing visitors to opt out of targeted advertising and the sale or sharing of their personal information.

---

[53] BBC's Privacy Settings as it was available when Plaintiffs opted out of cookies and tracking technologies on the Website.
[54] BBC's Privacy Policy, https://www.bbc.com/usingthebbc/privacy-policy (last visited Dec. 23, 2025).

114.    Defendant represented, in substance, that it would honor visitors' choice to limit or prevent the collection, use, and disclosure of their personal information by Tracking Entities.



*Figure 14 - BBC's Privacy Settings interface representing visitors with an option of preventing the selling of visitor information and targeted advertising*

115.    The Tracking Tools are enabled by default, and the system operates as an opt-out mechanism that requires visitors to disable tracking.

116.    Defendant's Privacy Settings led Plaintiffs and similarly situated Website visitors to believe that they had disabled the sale or sharing of their information and all non-essential cookies. The Privacy Settings also led visitors to believe that Defendant would not allow Tracking Entities through cookies or other technologies to access visitors' Sensitive Information in connection with the Website.

117.    These representations were false. Defendant did not comply with visitors' expressed preferences. When visitors selected to opt out of the sale or sharing of Sensitive

Information, they communicated that they did not consent to the placement or transmission of Tracking Tools, including non-essential cookies. Defendant nevertheless caused the Tracking Tools, including those cookies, to be placed on visitors' browsers and devices, which caused visitors' Sensitive Information to be transmitted to Tracking Entities. Certain aspects of the operation of Tracking Tools on the Website can be observed using browser developer tools that record network traffic transmitted to and from a visitor's device while the visitor interacts with the Website.

118.     Network traffic logs generated through these tools reveal HTTP requests and transmissions between visitors' browsers and Tracking Entities during visitors' visits to and interactions with the Website.



*Figure 15 – Screenshot depicting Developer Tool on the visitor's browser to record and capture network activity*

119.     These network logs demonstrate that, even after visitors rejected non-essential cookies and opted out of the sale or sharing of their personal information, visitors' browsers

continued to transmit numerous GET and POST HTTP requests to Tracking Entities and continued to use non-essential cookies to track visitors.



*Figure 16 – Piano Analytics tracking a visitor who declined all unnecessary cookies*



*Figure 17 – ScoreCard Research tracking a visitor who declined all unnecessary cookies*



*Figure 18 – Google Analytics tracking a visitor who declined all unnecessary cookies*

120.    Through these ongoing transmissions, Website visitors' Sensitive Information was disclosed to Tracking Entities. The Tracking Entities and Tracking Tools track visitors across websites and over time, correlate visitor behavior with other datasets, and compile detailed visitor profiles reflecting preferences, behaviors, demographics, and inferred characteristics. This information is monetized for advertising, analytics, and marketing purposes. The Tracking Tools executed on visitors' browsers enable Tracking Entities that are separate from the parties to the communications to access and use visitors' Sensitive Information. These Tracking Entities collect and use the intercepted communications for their own commercial purposes.

## V.    Plaintiffs Did Not Consent to Defendant's Sharing of Plaintiffs' Sensitive Information

121.    Plaintiffs were unaware that the Tracking Tools intercepted their confidential communications with the Website.

122.    Plaintiffs reasonably believed that their communications with the Website were made in confidence.

123.    Defendant provided no notice identifying who intercepted, recorded, or used the contents of those communications. Plaintiffs, therefore, had no opportunity to provide consent to the interception of their search terms.

124.    Piano and ScoreCard warn website operators that use of their tracking tools requires notice and valid consent before collecting protected visitor data or allowing Tracking Entities' interception. Defendant agreed to those terms to deploy the Tracking Tools.

125.    Despite those requirements, Defendant provided Plaintiffs with no notice that the Tracking Tools operated on the Website.

126.    Plaintiffs, therefore, did not and could not consent to the collection or sharing of their data when visiting the Website, running searches, or requesting or obtaining videos.

## VI.    By Disclosing Subscriber's Personally Identifiable Information to Piano, Defendant Violated the VPPA

127.    The Video Privacy Protection Act, 18 U.S.C. § 2710(b)(1), prohibits video tape service providers from disclosing the personally identifiable information of their consumers to a third party.

128.    The VPPA ensures that businesses and people who sell or deliver video tapes, or similar audio video content, do not reveal their consumers' history of requesting or obtaining specific audio video materials to any other party.

129.    Defendant, through its disclosures of the browsing and viewing activities of its Subscribers to Piano, violated the VPPA.

130.    Defendant qualifies as a "video tape service provider" under the VPPA because it creates and delivers ad-supported and subscription-supported audio video content across its Website and apps, thereby "engag[ing] in the business, in or affecting interstate or foreign

commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." 18 U.S.C. § 2710(a)(4).

131.    Defendant curates, hosts, provides access to, and delivers thousands of videos on the Website, both included within articles and as standalone webpages.

132.    Defendant's Website features a substantial library of video content, including news clips, documentaries, and full episodes of various BBC shows, which consumers may request and view directly through their browsers.

133.    The VPPA defines a "consumer" as any "renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).

134.    Plaintiffs and those similarly situated are "consumers" because they created accounts with and subscribed to the BBC, by exchanging their valuable personal information and/or money for benefits from the Website, including access to Defendant's audiovisual content. Consumers with a free and paid accounts gain access to multiple features, including the ability to save articles and videos for later viewing[55], receive personalized article and video suggestions[56] and watch exclusive prerecorded video content.[57]

135.    Plaintiff Chisholm is a "consumer" because he subscribed to the Website, paying an annual fee to Defendant in exchange for full access to the news articles, podcast and pre-recorded videos on the Website.[58]

---

[55] *Adding things on the BBC* https://www.bbc.co.uk/usingthebbc/account/adding-things-on-the-bbc/ (last visited Jan. 28, 2026).

[56] *How is the BBC personalised to me?* https://www.bbc.co.uk/usingthebbc/account/how-is-the-bbc-personalised-to-me/ (last visited Jan. 28, 2026).

[57] *The BBC on voice devices* https://www.bbc.co.uk/usingthebbc/account/the-bbc-on-voice-devices/ (last visited Jan. 28, 2026).

[58] https://www.bbc.com/subscribe (last visited on Jan. 28, 2026).

136.    Plaintiff Ramirez is a "consumer" because he maintains a registered user account with the Website in order to, *inter alia*, access and view videos, thereby establishing a formal relationship with the Defendant involving the exchange of his personal information for his account.

137.    The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Defendant disclosed to Piano the name and description of the videos that Plaintiffs watched, the URL of the webpages that Plaintiffs viewed, and the email addresses and general location of the Plaintiffs. Collectively, this information is personally identifiable information, as it discloses the identity of the Plaintiffs and the video materials that they requested and obtained from Defendant. *See Aldana v. GameStop, Inc.,* No. 22-CV-7063-LTS, 2024 WL 708589, at *7 n.5 (S.D.N.Y. Feb. 21, 2024).

138.    Plaintiffs' and the Class Members' personally identifiable information was transmitted in key-pair values contained in data files, rather than embedded in URLs, which clearly separated the data by category and value, including consumers' personal address, and URLs and titles of audiovisual materials.

A.    **Injunctive Relief of Defendant's Ongoing VPPA and Wiretap Violations**

139.    An actual and immediate controversy exists between Plaintiffs, the putative Class and Subclass members, and Defendant. The parties have direct and substantial opposing interests. Defendant has violated and continues to violate Plaintiffs' and the Class Members' rights under the VPPA, CIPA, and Wiretap Act.

140.    Plaintiffs are likely to succeed on the merits of these claims. Plaintiffs are entitled to declaratory and injunctive relief.

141.    Plaintiffs lack an adequate remedy at law to stop Defendant's ongoing violations of the Wiretap Act. Absent injunctive relief, Defendant will continue to infringe the privacy rights of Plaintiffs and the Class Members. Defendant will continue to disclose Sensitive Information. Injunctive relief serves the public interest.

142.    BBC violated its obligations under the VPPA, CIPA, and the Wiretap Act. It deployed the Tracking Tools on the Website. It enabled Tracking Entities to access Subscribers' Sensitive Information.

143.    Defendant provided no notice of the Tracking Tools. Defendant provided no disclosure regarding the scope of information shared. Defendant failed to seek or obtain consent for the use of the Tracking Tools.

144.    Ongoing violations present a continuing threat of injury that requires temporary, preliminary, and permanent injunctive relief.

## TOLLING

145.    Defendant's conduct tolled the statutes of limitations applicable to Plaintiffs' and the Classes' claims, based on delayed discovery.

146.    Plaintiffs and Class Members did not know, and could not have known, that the Tracking Tools disclosed their information and communications to Tracking Entities when they used the Website. Reasonable diligence would not have revealed Defendant's conduct.

147.    Defendant embedded the Tracking Tools into the Website without disclosure, providing no indication that communications would be shared with Tracking Entities.

148.    Defendant possessed exclusive knowledge that the Tracking Tools would disclose protected information and confidential communications. Defendant failed to disclose that

interacting with the Website would result in disclosure of Sensitive Information to Tracking Entities.

149.    The technical nature of the Tracking Tools prevented discovery of the full scope of Defendant's conduct. No disclosures or visible indicators alerted a reasonable visitor to interception or disclosure.

150.    Plaintiffs and the Class Members first learned of Defendant's conduct through investigation conducted in preparation for this action.

## CLASS ACTION ALLEGATIONS

151.    Plaintiffs bring this action individually and on behalf of the following Class and Subclasses:

> **Nationwide Class**: All persons in the United States who visited the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "Class").

> **California Subclass**: All persons in California who visited the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "California Subclass").

> **New York Subclass**: All persons in New York who visited the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Tracking Tools (the "New York Subclass").

> **Subscriber Subclass**: All persons who subscribed to the BBC and subsequently watched videos on the Website that had their Sensitive Information improperly disclosed to Tracking Entities through the use of the Tracking Tools (the "Subscriber Subclass").

152.    Specifically excluded from the Class and Subclasses are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its

officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

153.    Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

154.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

155.    Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Classes. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

156.    Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, used the Website and had their Sensitive Information collected and disclosed by Defendant.

157.    Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have no interests antagonistic to, nor in conflict with, the Classes. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

158.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class and Subclass Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class and Subclass Members to seek

redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

159.    <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

a.    Whether Defendant collected Plaintiffs' and the Class's Sensitive Information;

b.    Whether Defendant unlawfully disclosed and continues to disclose the Sensitive Information of Visitors of the Website in violation of the Federal Wiretap Act and CIPA;

c.    Whether Defendant's disclosures were committed knowingly; and

d.    Whether Defendant disclosed Plaintiffs' and the Classes' Sensitive Information without consent.

160.    Information concerning Defendant's Website's data-sharing practices is available from Defendant or the Tracking Entities.

161.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

162.    The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for the Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

163.    Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

164.    Given that Defendant's conduct is ongoing, monetary damages are insufficient, and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I - VIOLATION OF THE FEDERAL WIRETAP ACT
### 18 U.S.C. § 2510, et seq.
**(On Behalf of Plaintiffs and the Nationwide Class)**

165.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

166.    Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

167.    The Federal Wiretap Act, codified at 18 U.S.C. § 2510 et seq. (the "Wiretap Act"), prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. 18 U.S.C. § 2511.

168.    The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(

169.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

170.    The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

171.    The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part

by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

172.    The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

173.    Defendant is a "person" within the meaning of the Wiretap Act.

174.    The Tracking Tools embedded on Defendant's Website constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

175.    Plaintiffs had a reasonable expectation of privacy in their electronic communications with Defendant's Website, including their searches, browsing activity, and video watching activity, particularly where Defendant represented through its cookie settings, and Privacy Policy that visitors could opt out of the sale/sharing of personal information.

176.    A reasonable expectation of privacy depends on the nature of the contents intercepted. Communications reflecting visitors' choices, intent, and behavior on a commercial website are sensitive. Such communications include searches, website selections, and video watching activity. They convey the substance and meaning of the communication.

177.    Plaintiffs, as reasonable visitors, are entitled to assume that disclosure of the contents of their communications occurs lawfully and with consent. The opposite assumption would require visitors to expect routine violations of their privacy.

178.    Plaintiffs reasonably expected that Tracking Entities were not intercepting, recording, or using the contents of their electronic communications with Defendant's Website.

179.    During the relevant time period, Plaintiffs' electronic communications with the Website were intercepted at the moment they were sent and transmitted to Tracking Entities

without Plaintiffs' consent. The intercepted information was monetized. Defendant combined that information with data collected about Plaintiffs across the internet and used it for advertising, analytics, and marketing optimization.

180.    Interception occurred whenever Plaintiffs interacted with the Website, including when they navigated webpages, used search features, viewed articles and videos, or otherwise communicated information to the Website through their browsers.

181.    At all relevant times, Defendant acted knowingly, willfully, and intentionally. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on the Website and understood that doing so would result in the interception and transmission of visitors' communications to Tracking Entities.

182.    Plaintiffs were not asked to consent to the interception, recording, disclosure, or use of their electronic communications with the Website by the Tracking Entities. Plaintiffs instead affirmatively declined sharing/selling their personal information through Defendant's Your Privacy Choices interface.

183.    The unauthorized interception and use of Plaintiffs' electronic communications by the Tracking Entities was only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. 18 U.S.C. § 2511(1)(a). As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiffs have been damaged and are entitled to relief under 18 U.S.C. § 2520, including: (1) damages in an amount to be determined at trial, assessed as the greater of actual damages suffered by Plaintiffs and any profits made by the intercepting parties as a result of the violations, or (b) statutory damages of the greater of $100 per day per violation or $10,000; appropriate equitable and declaratory relief; and (3) reasonable attorneys' fees and costs.

**COUNT II - VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, et seq.**
**(On Behalf of Plaintiffs and the Subscriber Subclass)**

184.     Plaintiffs hereby incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

185.     Plaintiffs bring this count on behalf of themselves and the members of the Subscriber Subclass.

186.     The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

187.     The VPPA also prohibits direct marketers from using disclosed titles and descriptions of videos to market goods and services directly to consumers. 18 U.S.C. § 2710(b)(2)(D)(ii).

188.     "[P]ersonally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

189.     A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

190.     Defendant violated this statute by knowingly disclosing Plaintiffs' and other Subscriber Subclass Members' personally identifiable information to Piano.

191.     Through the Website, Defendant engaged in the business of delivering video content to Subscribers, including Plaintiffs and the other Subscriber Subclass Members. The Website delivers videos to Subscribers, including Plaintiffs and the other Class Members, by

transmitting the content of the videos from its servers to Plaintiffs' and the Subscriber Subclass Members' devices.

192.    Defendant is a "video tape service provider" because they curate, host, provide access to, and deliver thousands of videos on the Website, both included within articles and as standalone webpages, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." 18 U.S.C. § 2710(a)(4).

193.    Defendant solicits individuals to pay to and/or subscribe to the BBC.

194.    Plaintiffs and members of the Subscriber Subclass are "consumers" because they subscribe to Defendant's Website. 18 U.S.C. § 2710(a)(1).

195.    Plaintiffs and the members of the Subscriber Subclass subscribed to the BBC by providing the Website with valuable personal information in exchange for an account, or by paying for a monthly or annual subscription. Subscribers received exclusive benefits, including access to prerecorded video materials.

196.    Plaintiffs and members of the Subscriber Subclass requested, obtained, and viewed videos on the Website.

197.    Defendant disclosed Plaintiffs' and the Subscriber Subclass Members' personally identifiable information to Piano. Defendant utilized Piano Analytics, which forced Plaintiffs' web browsers to transmit Plaintiffs' identifying information, like their email addresses, along with Plaintiffs' and the Subscriber Subclass Members' event data, including the titles, URLs, and descriptions of the videos they viewed, to Piano.

198.    Defendant knowingly disclosed Plaintiffs' and the Subscriber Subclass Members' PII, which is triggered automatically through Defendant's use of the Piano Analytics. No

additional steps on the part of the Defendant, Piano, or any Tracking Entities are required. Once Piano's routine exchange of information is complete, the email address that becomes available can be used by any individual to easily identify a Subscriber.

199.    Plaintiffs and members of the Subscriber Subclass did not provide Defendant with any form of consent, either written or otherwise, to disclose their PII to Piano. Defendant failed to obtain "informed, written consent" from Subscribers—including Plaintiffs and members of the Subscriber Subclass—"in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

200.    Defendant's disclosures of Plaintiffs' and the Subscriber Subclass Members' PII were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Piano were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2). Instead, Plaintiffs' and the Subscriber Subclass Members' PII was used for improving marketing effectiveness.

201.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(b)(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

202.    On behalf of themselves and the Subscriber Subclass, Plaintiffs seek: (i) declaratory relief as to Defendant; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Subscriber Subclass by requiring Defendant to comply with the VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

### COUNT III - INTRUSION UPON SECLUSION
#### (On Behalf of Plaintiffs and the Nationwide Class)

203.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

204.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against the Defendant.

205.    Defendant intentionally intruded upon Class Members' solitude or seclusion in that it effectively placed the Tracking Entities in the middle of conversations, including Sensitive Information to which it was not an authorized party.

206.    Defendant's participation in the Tracking Entities' tracking and interception of Sensitive Information was not authorized by Plaintiffs or Class Members.

207.    Defendant's enabling of the Tracking Entities' intentional intrusion into Plaintiffs' and Class Members' internet communications, including Sensitive Information, was highly offensive to a reasonable person in that they violated federal and state criminal and civil laws designed to protect individuals' privacy and against theft.

208.    Secret monitoring of Sensitive Information is highly offensive behavior.

209.    Wiretapping and the surreptitious recording of communications, including PII, is highly offensive behavior.

210.     Public polling on internet tracking has consistently shown that a majority of Americans believe it is important or very important to be "in control of who can get information" about them. Polling also shows that Americans do not want to be tracked without their consent and want to be in "control[] of what information is collected about [them]." The desire to control personal information increases when an individual is handling PII.

211.     Plaintiffs and Class Members were harmed by Defendant's facilitation of Tracking Entities' intrusion upon their seclusion. Plaintiffs and Class Members are entitled to reasonable compensation, including disgorgement of profits derived from unlawful internet tracking.

**COUNT IV - VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiffs and the California Subclass)**

212.     Plaintiffs hereby incorporate by reference and reallege herein the allegations contained in all preceding paragraphs of this Complaint.

213.     Plaintiffs bring this count on behalf of themselves and all members of the California Subclass.

214.     CIPA provides that a person is liable to another where, "by means of any machine, instrument, contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees

with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

215.    The Ninth Circuit confirmed that one of the purposes of wiretapping statutes is to "prevent the acquisition of the contents of a message by an unauthorized third-party . . . ." *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020). With respect to CIPA, the California Supreme Court has similarly concluded that the statute is intended to protect a person's communications "from a situation where the other person on the other end of the line permits an outsider" to monitor the communication. *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985); *see Smith v. LoanMe*, 11 Cal. 5th 183, 200 (2021).

216.    The Website, including the Tracking Tools placed upon it, is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

217.    Within the relevant time period, Plaintiffs and members of the California Subclass communicated browsing history to Defendant, with the expectation of receiving content provided by Defendant.

218.    During the relevant time period, Defendant acted without the consent of all parties to the communication. Defendant and Tracking Entities willfully read, or attempted to read or learn, the contents or meaning of Plaintiffs' and California Subclass Members' electronic communications. The interception occurred contemporaneously with the communications' transit over wire, line, or cable. The communications were sent from or received at locations within California.

219.    The information collected by Tracking Tools was not for the sole benefit of Defendant.

220.    Within the relevant time period, Defendant aided, agreed with, conspired with, and employed the Tracking Entities to implement the Tracking Tools and to intercept, collect, and disclose electronic communications in violation of CIPA § 631.

221.    Plaintiffs and members of the California Subclass did not authorize or consent to the tracking, interception, and collection of any of their electronic communications.

222.    The violation of section 631 constitutes an invasion of privacy sufficient to confer Article III standing.

## COUNT V - VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 638
**(On Behalf of Plaintiffs and the California Subclass)**

223.    Plaintiffs hereby incorporate by reference and reallege herein the allegations contained in all preceding paragraphs of this Complaint.

224.    Plaintiffs bring this count on behalf of themselves and all members of the California Subclass.

225.    Under CIPA Section 638, a person "may not install or use a pen register or a trap and trace device without first obtaining a court order. . . ." Cal. Penal Code § 638.51.

226.    "'Trap and trace device' means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of the communication." Cal. Penal Code § 638.50(c).

227.    "Process" includes "software that identifies consumers, gathers data, and correlates that data through unique 'fingerprinting.'" *Greenley v. Kochava, Inc.*, 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

228.    Section 638 of CIPA prohibits the installation or use of "a pen register or a trap and trace device without first obtaining a court order . . . ."[59]

229.    "Pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."[60]

230.    Given CIPA's purpose to protect Californians' privacy, "it seems very unlikely that the state Legislature meant to permit the installation and implementation of pen registers 'so long as those devices also record the contents of third parties' communications.'" *Gabrielli v. Haleon US Inc.*, No. 25-cv-02555-WHO, 2025 U.S. Dist. LEXIS 169503, at *34 (N.D. Cal. Aug. 29, 2025).

231.    California Penal Code § 638.51(a) provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order. . . ." No court order to install pen register or trap and trace devices via the Tracking Tools was obtained by Defendant.

232.    Defendant deploys the Tracking Tools on the Website and thereby uses pen register and trap and trace processes. The Tracking Tools capture phone numbers, email addresses, routing, addressing, and other signaling information of Website visitors. The Tracking Tools identify the source of incoming electronic and wire communications to the Website.

233.    Defendant was not authorized by any court order to use pen register and trap and trace devices to track Plaintiffs' and California Subclass Members' Sensitive Information.

---

[59] Cal. Penal Code § 638.51.
[60] *Id.* § 638.50(b).

234.    Defendant did not obtain consent from Plaintiffs and Class Members before using pen register or trap and trace technology to identify visitors of its Website and has violated Section 638.51.

235.    As a direct and proximate result of Defendant's conduct, Plaintiffs' and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

### COUNT VI - VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code §§ 1770, et seq. ("CLRA")
### (On Behalf of Plaintiffs and the California Subclass)

236.    Plaintiffs hereby incorporate by reference and reallege herein the allegations contained in all preceding paragraphs of this Complaint.

237.    The CLRA prohibits any person from undertaking any "unfair methods of competition and unfair or deceptive acts or practices" in a transaction "that results in the sale or lease of goods or services to any consumer."

238.    Defendant is a person under the CLRA.

239.    Plaintiffs are consumers of Defendant's services under the CLRA as Plaintiffs used Defendant's Website.

240.    Defendant undertook deceptive acts or practices, in violation of the CLRA, by failing to disclose the presence of the tracking tools on the Website. Defendant violated section 1770(a) of the CLRA by "[m]isrepresenting the source, sponsorship, approval, or certification of goods or services."

241.    By this failure to disclose, Defendant violated section 1770(a)(5) of the CLRA by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

242. By this failure to disclose, Defendant violated section 1770(a)(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

243. Defendant's failure to disclose was material to Website visitors, such as Plaintiffs. Visitors could have chosen a different website that did not use Tracking Tools. Visitors could have chosen a website that disclosed the presence of Tracking Tools and allowed them to be disabled. Visitors could have chosen a website that requested consent before implementing Tracking Tools.

244. Defendant undertook deceptive acts or practices, in violation of the CLRA, by fraudulently misrepresenting the presence of the Tracking Tools on the Website.

245. By this fraud, Defendant violated section 1770(a)(5) of the CLRA by "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

246. By this fraud, Defendant violated section 1770(a)(14) of the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."

247. Defendant's failure to disclose was material to Website visitors, such as Plaintiffs. Visitors could have chosen a different website that did not use Tracking Tools. Visitors could have chosen a website that disclosed the presence of Tracking Tools and allowed them to be disabled. Visitors could have chosen a website that requested consent before implementing Tracking Tools.

248. As a direct and proximate result of Defendant's conduct, Plaintiffs and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

**COUNT VII - VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL")**
**(On Behalf of Plaintiffs and the California Subclass)**

249.    Plaintiffs hereby incorporate by reference and reallege herein the allegations contained in all preceding paragraphs of this Complaint.

250.    The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice."

251.    By actively and affirmatively misleading consumers by omitting to inform them of the tracking pixels on the Website in violation of the CLRA, Defendant acted unlawfully in violation of the UCL.

252.    By actively and purposefully installing a wiretap without a visitor's consent in violation of the Federal Wiretap Act and CIPA, Defendant acted unlawfully in violation of the UCL.

253.    By actively and purposefully installing a pen register and trap and trace device without visitors' consent in violation of CIPA, Defendant acted unlawfully in violation of the UCL.

254.    By actively and fraudulently deceiving visitors about its ability to disable the tracking pixels, Defendant acted unlawfully in violation of the UCL.

255.    Defendant failed to disclose the presence of the Tracking Tools on the Website. Defendant disclosed visitors' personal identifying information without knowledge or consent. Defendant disclosed visitors' information to Tracking Entities to build personal profiles without knowledge or consent. Defendant failed to disclose that it was wiretapping visitors' communications with the Website. Defendant fraudulently deceived visitors about its ability to disable the tracking pixels. Through this conduct, Defendant acted unfairly in violation of the UCL.

256.    Plaintiffs have standing to bring claims against Defendant under the UCL. Plaintiffs' information was tracked and recorded without consent. Plaintiffs' data was used to build personal profiles for advertising purposes without consent.

257.    Plaintiffs would have considered it important to the decision to visit Defendant's Website to know that their data was being tracked and recorded without consent.

258.    Because of Defendant's UCL violations described above, Plaintiffs suffered injury by losing control of their personal data and having their personal information tracked and recorded without their consent.

259.    As a direct and proximate result of Defendant's conduct, Plaintiffs and California Subclass Members suffered losses and were damaged in an amount to be determined at trial.

## COUNT VIII -VIOLATIONS OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES N.Y. GEN. BUS. LAW § 349
### (On behalf of Plaintiffs and the New York Subclass)

260.    Plaintiffs incorporate by reference and reallege herein the allegations contained in all preceding paragraphs of this Complaint.

261.    N.Y. Gen. Bus. ("GBL") § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state. . . ."

262.    Defendant conducts consumer-oriented business and trade from its headquarters in New York, New York, including the operation of its Website, in its advertising, and throughout the country, as required by GBL § 349.

263.    Defendant violated GBL § 349 by deceptively representing, through its Privacy Settings, that visitors could control the collection, sale, or sharing of their Sensitive Information, while continuing to permit Tracking Entities to collect and disclose visitors' data regardless of visitors' privacy choices.

264.    Defendant's misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, falsely represented that visitors were provided a particular level of privacy protection and control over their Sensitive Information, when in fact Defendant continued to collect, disclose, and transmit visitors' Sensitive Information to Tracking Entities through the Tracking Tools regardless of visitors' privacy selections.

265.    Defendant's misrepresentations and partial misrepresentations, including the misrepresentations, omissions, active concealment, and other deceptive conduct described herein, were directed at consumers, including Plaintiffs, visiting Defendant's Website, occurred repeatedly in the course of Defendant's online business practices, and were capable of deceiving a substantial portion of the consuming public with respect to the collection and disclosure of their Sensitive Information.

266.    The facts misrepresented, concealed, or not disclosed by Defendant were material in that Plaintiffs and the Class, and other reasonable visitors, would have considered them in deciding whether and how to interact with Defendant's Website. Had Plaintiffs and members of the Class known that Defendant continued to collect and disclose their Sensitive Information through tracking technologies regardless of visitors' privacy selections, they would not have visited the Website, would have limited their interactions with it, or would have taken steps to avoid or block such data collection.

267.    Defendant alone possessed the information that was material to the Plaintiffs and Class and failed to disclose such material information to visitors.

268.    Defendant has engaged and continues to engage in deceptive conduct in violation of GBL § 349.

269.     The   misrepresentations   and   partial   misrepresentations,   including   the
misrepresentations, omissions, active concealment, and other deceptive conduct described herein,
caused Plaintiffs and the Class to suffer injury in the form of actual damages, including the loss
of control and value of their Sensitive Information and the unauthorized disclosure of Sensitive
Information to Tracking Entities, which they would have avoided had Defendant accurately
disclosed its data-collection and tracking practices.

270.     Defendant intended for Plaintiffs and the Class to rely on its misrepresentations
and partial misrepresentations, including the misrepresentations, omissions, active concealment,
and other deceptive conduct described herein, regarding the nature and extent of its data-
collection and tracking practices when deciding whether and how to interact with Defendant's
Website, while unaware of the undisclosed material facts.

271.     GBL § 349 applies to the Plaintiffs and Class because the State of New York has
an interest in regulating business conduct in the region. Defendant's U.S.-based operations
emanate from its New York, New York office, which is listed as a contact point for various
consumer-facing programs.

272.     Defendant's conduct has caused and is causing immediate and irreparable injury
to Plaintiffs and the Class. Defendant's conduct will continue to damage both the Plaintiffs and
Class Members and deceive the public unless enjoined by this Court.

273.     As a direct and proximate result of Defendant's violations, Plaintiffs, the Class,
and other reasonable visitors have been harmed, and that harm will continue unless Defendant is
enjoined from continuing to misrepresent and omit the true nature of its data-collection, tracking,
and information-sharing practices.

## COUNT IX-VIOLATIONS OF NEW YORK'S FALSE ADVERTISING LAW
## N.Y. GEN. BUS. LAW § 350
### (On Behalf of Plaintiffs and the New York Subclass)

274.    Plaintiffs incorporate by reference and reallege herein the allegations contained in all preceding paragraphs of this Complaint.

275.    N.Y. Gen. Bus. ("GBL") § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

276.    Pursuant to GBL § 350-a, false advertising is defined as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect . . . [where "misleading" refers to] representations made by statement, word, design, . . . or any combination thereof, but also to the extent to which the advertising fails to reveal facts material in the light of such representations . . . ."

277.    Defendant knew or should have known that its representations regarding visitors' ability to control the collection, sale, or sharing of their Sensitive Information were false or misleading because the Tracking Tools continued to collect and disclose visitors' data through the Website regardless of visitors' cookie preferences.

278.    Defendant purposely misrepresented, actively concealed, and failed to disclose material facts regarding its data-collection, tracking, and information-sharing practices to visitors, including Plaintiffs and the Class.

279.    The facts misrepresented, concealed, or otherwise undisclosed by Defendant were material in that Plaintiffs, the Class, and other reasonable visitors would have considered them when deciding whether and how to interact with Defendant's Website. Had Plaintiffs and the Class known that Defendant continued to collect and disclose their Sensitive Information through Tracking Tools regardless of visitors' cookie preferences, they would not have visited the

Website, would have limited their interactions with it, or would have taken steps to avoid such data collection.

280.    Defendant obtained a benefit from Plaintiffs and the Class by collecting, using, and disclosing their Sensitive Information through Tracking Entities, while depriving them of the ability to control the use and sharing of that Sensitive Information, despite the availability of reasonable alternatives that do not engage in the same deceptive data-collection practices.

281.    Defendant's conduct caused Plaintiffs and the Class to suffer actual damages by depriving them of the ability to make informed choices about the collection and disclosure of their personal information and by subjecting them to unauthorized tracking and data sharing, which they would have avoided had Defendant accurately disclosed its data-collection practices.

282.    As a direct and proximate result of Defendant's violation of New York General Business Law § 350, Plaintiffs and the Class have been injured, and that harm will continue unless Defendant is enjoined from continuing to misrepresent and omit the true nature of its data-collection, tracking, and Sensitive Information-sharing practices on the Website.

283.    Defendant's conduct has also substantially injured the public, as visitors across the country were exposed to and relied upon Defendant's representations regarding its data-privacy practices while unaware of material omissions—specifically, the failure to disclose that visitors' personal information was collected, shared, and disclosed to Tracking Entities through Tracking Tools regardless of visitors' cookie preferences. Defendant's omissions deprived visitors of the ability to make informed decisions about their online privacy and created a false impression that visitors' choices meaningfully controlled data collection and sharing, thereby undermining public trust in websites that purport to offer transparency.

284.    Defendant's conduct thus caused real-world harm and poses an ongoing risk of further injury if not enjoined.

285.    Pursuant to GBL section 350-e, the Plaintiffs and the Class seek injunctive relief, declaratory relief, full refund, actual and punitive damages, or $500 (whichever is greater), statutory damages of three times the actual damages (up to $10,000), and attorneys' fees.

## COUNT X - COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
### (On Behalf of Plaintiffs and the Nationwide Class)

286.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

287.    Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

288.    Defendant made affirmative representations to visitors through the Privacy Settings and related disclosures. Defendant represented that visitors could opt out of the sale or sharing of personal information.

289.    Defendant represented that exercising those options would limit or prevent the deployment of Tracking Tools, including targeting and performance cookies, and would stop the transmission of visitors' browsing activity, interactions, and related data to the Tracking Entities.

290.    Defendant made these representations when visitors accessed the Privacy Settings.

291.    These representations were false and misleading. After visitors, including Plaintiffs, exercised their opt-out choices and declined the sale and sharing of their personal information, Defendant continued to deploy Tracking Tools and continued to transmit visitor data to Tracking Entities.

292.    Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code,

selected and configured the Tracking Tools, and determined how those tools operated in relation to visitors' expressed privacy choices.

293.    Defendant had the technical ability to prevent post-opt-out data transmissions and to configure the Website so that non-essential tracking ceased when visitors declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential tracking technologies based on visitor preferences, and Defendant could have implemented such measures.

294.    Defendant made misrepresentations with the intent to induce reliance by visitors, including Plaintiffs, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

295.    Plaintiffs and the Class Members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by exercising the opt-out controls instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

296.    Plaintiffs' reliance was reasonable because Defendant presented the cookie settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

297.    As a direct and proximate result of Defendant's fraudulent conduct, Plaintiffs and the Class Members suffered damages, including loss of privacy, loss of control over their personal information, and diminution in the value of their personal data.

298.    Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize visitors' data despite representing that such practices would cease upon opt-out.

299.    Plaintiffs and Class Members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, punitive damages where available, and injunctive relief to prevent further misrepresentations.

### COUNT XI - UNJUST ENRICHMENT
**(On Behalf of Plaintiffs and the Nationwide Class)**

300.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above in all preceding paragraphs of this Complaint.

301.    Plaintiffs bring this cause of action on behalf of themselves and all Class Members.

302.    Defendant obtained a benefit by collecting, processing, and enabling Tracking Entities' monetization of Plaintiffs' and Class Members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

303.    Defendant retained those benefits under circumstances in which the information was collected and transmitted without valid consent. The information was collected and transmitted in breach of Defendant's representations to visitors. Defendant's retention of those benefits is unjust.

304.    Plaintiffs and the Class Members conferred these benefits on Defendant, and Defendant has been unjustly enriched at the expense of Plaintiffs and the Class. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiffs and Class Members are entitled to the relief set forth below

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a)      For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representative of the Classes and their counsel as Class Counsel;

b)      For an order declaring the Defendant's conduct violates the statutes referenced herein;

c)      For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

d)      Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Defendant to immediately (i) remove the Tracking Tools from the Website or (ii) add, and obtain, the appropriate consent from Website visitors;

e)      An award of statutory damages or penalties to the extent available;

f)      For damages in amounts to be determined by the Court and/or jury;

g)      For pre-judgment interest on all amounts awarded;

h)      For an order of restitution and all other forms of monetary relief;

i)      An award of all reasonable attorneys' fees and costs; and

j)      Such other and further relief as the Court deems necessary and appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs demand a trial by jury of all issues so triable.

Dated: January 29, 2026

**LEVI & KORSINSKY, LLP**

By: <u>*Mark S. Reich*</u>
Mark S. Reich (MR-4166)
Gary Ishimoto *
Christopher V. DeVivo (5969787)
Michael N. Pollack (6173272)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: gishimoto@zlk.com
Email: cdevivo@zlk.com
Email: mpollack@zlk.com

*Counsel for Plaintiffs*

*\*pro hac vice* forthcoming

68